UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

08 APR 22 PM 4:00

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| DONALD W. CLEMENT, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>WELLPOINT, INC., ANGELA F. BRALY, WAYNE DEVEYDT and LARRY C. GLASSCOCK, )<br><br>Defendants. ) | CIVIL ACTION NO.<br><br>**1: 08-cv-0526-DFH-WTL**<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Donald W. Clement ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WellPoint, Inc. ("WellPoint" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal class action on behalf of purchasers of WellPoint's securities between January 23, 2008 and March 10, 2008 inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    WellPoint is the largest health benefits company in terms of commercial membership in the United States. Through its nationwide networks, the Company delivers a number of health benefit solutions through a broad portfolio of integrated health care plans and related services, along with a wide range of specialty products such as life and disability insurance benefits, pharmacy benefit management, dental, vision, behavioral health benefit services, as well as long term care insurance and flexible spending accounts. Headquartered in Indianapolis, Indiana, WellPoint is an independent licensee of the Blue Cross and Blue Shield Association and serves its members as the Blue Cross licensee for California; the Blue Cross and Blue Shield licensee for Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, Virginia (excluding the Northern Virginia suburbs of Washington, D.C.), Wisconsin; and through UniCare.

3.    On March 10, 2008, the Company shocked investors when it reduced its full year 2008 growth guidance from 15.3% to between 4% and 8% and stated that this would only occur if net realized gains were about $0.06 per share. Additionally, the Company decreased its first quarter 2008 guidance from $1.44 per share to between $1.16 and $1.26 per share, assuming net realized investment gain of $0.06 per share. The Company admitted that it had incurred higher than expected medical costs and lower than expected Fully Insured enrollment. The Company also blamed is troubles on a changing economic environment.

4.    Upon the release of this news, the Company's shares declined $18.66 per share, or 28.31 percent, to close on March 11, 2008 at $47.26 per share, on unusually heavy trading volume.

5.     The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects.   Specifically, defendants failed to disclose or indicate the following: (1) that the Company's medical costs were rising drastically, while at the same time the Company's reserves for medical costs were understated; (2) that the Company's growth in enrollment was in the less profitable sectors, such as self-funded members and products, and that the Company was not achieving sufficient new enrollment of Fully Insured Members; (3) that the Company's geographic diversity was not able to neutralize the adverse economic factors affecting the Company; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

6.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).   Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading

information, occurred in substantial part in this Judicial District. Additionally, WellPoint's principal executive offices are located within this Judicial District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

11.    Plaintiff, Donald W. Clement, as set forth in the accompanying certification, incorporated by reference herein, purchased WellPoint's securities at artificially inflated prices during the Class Period and has been damaged thereby.

12.    Defendant WellPoint is an Indiana corporation with its principal executive offices located at 120 Monument Circle, Indianapolis, Indiana.

13.    Defendant Angela F. Braly ("Braly") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and a member of the Company's Board of Directors.

14.    Defendant Wayne DeVeydt ("DeVeydt") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Executive Vice President.

15.    Defendant Larry C. Glasscock ("Glasscock") was, at all relevant times, Chairman of the Company's Board of Directors.

16.    Defendants Braly, DeVeydt and Glasscock are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of WellPoint's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the

4

Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

17.    WellPoint is the largest health benefits company in terms of commercial membership in the United States. Through its nationwide networks, the Company delivers a number of health benefit solutions through a broad portfolio of integrated health care plans and related services, along with a wide range of specialty products such as life and disability insurance benefits, pharmacy benefit management, dental, vision, behavioral health benefit services, as well as long term care insurance and flexible spending accounts. Headquartered in Indianapolis, Indiana, WellPoint is an independent licensee of the Blue Cross and Blue Shield Association and serves its members as the Blue Cross licensee for California; the Blue Cross and Blue Shield licensee for Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, Virginia (excluding the Northern Virginia suburbs of Washington, D.C.), Wisconsin; and through UniCare.

## Materially False and Misleading
## Statements Issued During the Class Period

18.    The Class Period begins on January 23, 2008.  On this day, the Company issued a

press release entitled "WellPoint Reports Fourth Quarter and Full Year 2007 Results."  Therein,

the Company, in relevant part, stated:

> WellPoint, Inc. (NYSE: WLP) today announced that fourth quarter 2007 net income was $859.1 million, or $1.51 per share, which included net realized investment gains of less than $0.01 per share. Net income in the fourth quarter of 2006 was $801.1 million, or $1.28 per share, which included net realized investment gains of $0.01 per share. Full year 2007 net income was $5.56 per share, which included $0.01 per share in net realized investment gains. Net income for full year 2006 was $4.82 per share, which included tax benefits of $0.04 per share due to a change in the Company's state tax apportionment factors.

> *"We are pleased that WellPoint achieved its earnings per share expectations during 2007 and continued its strong organic membership growth. We view this as an excellent indication that customers continue to find great value in the products and services we are providing to the marketplace," said Angela F. Braly, president and chief executive officer of WellPoint, Inc. "As we continue to grow, we are also operating more efficiently each year. During 2007, we were able to reduce our general and administrative costs by more than $175 million while servicing 708,000 new medical members."*

> *"We remain confident in our earnings per share target of $6.41 for 2008, which represents annual growth of 15.3 percent," said Wayne S. DeVeydt, chief financial officer of WellPoint, Inc. "We expect to continue generating strong cash flow in excess of our net income, and we plan to utilize our capital to expand product offerings, enhance services and improve returns for our shareholders. We expect to repurchase more than $4.0 billion of our stock during 2008, subject to market conditions."*

*        *        *

**OUTLOOK**

Full Year 2008:

- *The Company continues to expect net income of $6.41 per share, representing growth of 15.3% over 2007.*

- *Year-end medical enrollment is now expected to be approximately 35.6 million members, representing growth for the year of approximately 800,000 members.*

- *Operating revenue is now expected to total approximately $62.6 billion.*

The benefit expense ratio is expected to be approximately 81.6 percent.

The SG&A expense ratio is expected to be approximately 14.4 percent.

The Company continues to expect operating cash flow of $4.4 billion, or 1.2 times net income. [Emphasis added.]

19.     Also on January 23, 2008, WellPoint conducted a conference call with analysts and investors. Therein, the Company, in relevant part, stated:

[Braly]: *While our 2008 membership guidance is lower, we are maintaining our $6.41 earnings per share guidance as the reduced membership in these areas had nominal contributions to EPS.*

*         *         *

[DeVeydt]: *We are very pleased with our financial results this quarter of $1.51 in earnings per share that include less than $1.01 per share in net realized investment gains.* Premium revenue was a record $14.3 billion in the fourth quarter of '07, an increase of $972 million or 7.3% over 4Q of '06 due to disciplined pricing in our Local Group business and growth in State Sponsored and Medicare Advantage business. Administrative fees were $914 million in the fourth quarter of '07, an increase of $9 million or 1% over 4Q of '06, due primarily to growth in our National Accounts business, including BlueCard and Local Group.

Self-funded membership increased by 992,000 members in 2007. During the year, 235,000 members switched from our fully insured plans to self-funded plans, and this includes 144,000 Connecticut Medicaid members.

The full-year 2007 benefit expense ratio was 82.4%, an increase of 120 basis points from 81.2% in 2006. Approximately 80 basis points of the increase were driven by the medical business of our Specialty, Senior and State Sponsored business reporting segment. The remaining increase includes our business mix shift to a larger proportion of higher loss ratio products and less favorable than anticipated reserve development from 2006 and 2007. The benefit expense ratio was 82.9% in the fourth quarter of 2007, an increase of 190 basis points from 81% in the prior year quarter. The higher than expected 4Q '07 benefit expense ratio resulted from items that generally should not impact 2008. What I would like to do is take a few minutes to walk you through the specifics.

As we previously discussed, 2007 was unfavorably impacted by 2006 reserves that developed less favorably in 2007 than anticipated. This contributed 60 basis points of a difference between our 4Q '06 and 4Q '07 benefit expense ratios. In addition, higher than anticipated medical claims in our Ohio and Connecticut state-sponsored operations impacted the fourth-quarter 2007 benefit expense ratio by about 40 basis points. We incurred operating losses in both of these programs in 2007. We've taken fiscally responsible action in our problematic State Sponsored programs in Ohio and Connecticut. *As Angela noted, we are currently in the process of exiting the Ohio CFC Medicaid program due to the inability to obtain fiscally sound rates. The Connecticut Medicaid contract converted to a self-funded arrangement during the fourth quarter of 2007 and also in California, we resolved pricing in all but one county and we expect resolution in that county this quarter.*

Forty basis points of the difference in benefit expense ratio include a mix shift with a larger proportion of our business being in higher loss ratio products, and other items.

And finally, we also experienced a relatively high level of intra-year reserve adjustments in the CCB segment during the fourth quarter of 2007, and this unfavorably impacted the comparison to the fourth quarter of 2006 by another 50 basis points. We are migrating to fewer claims systems and streamlining our operations and processes. As a result, we've seen a slowdown of certain claims processing and our September 30th, 2007 reserves did not completely adjust for this slowdown. In the fourth quarter, we

dedicated resources to address this issue and improved the timeliness of affected claims processing. We have carefully evaluated our year-end reserves. We've adjusted our completion factors to better take business process changes into consideration and are confident that our reserving is consistent, conservative, and appropriate, maintaining our high single-digit margin for adverse development.

So our 2008 benefit expense ratio guidance remains at 81.6% for the year, given the strong full-year 2007 operating results in our CCB segment, our continued outlook for stable medical cost trends in 2008, and the expected improvements in our State Sponsored operations. We continue to price our business so that our expected premium yield exceeds total cost trend, where total cost trend includes medical costs and selling, general and administrative expenses. As evidenced by our announced withdrawal from the Ohio CFC Medicaid program, we remain very disciplined in our underwriting approach and do not pursue business that we believe is priced below our profitability targets. Our 2007 medical cost trend was less than 8% and we continue to expect our 2008 medical cost trend to also be less than 8%.

*     *     *

[Analyst]: I'm going to come at this head on, so I apologize if it comes off across in a tough way, but it seems to me that your medical trends came in higher than expected, if you needed to increase your reserves related to '07. So baseline medical trend looks like it was higher than you thought. And yet, we're hearing from the marketplace that you relaxed pricing entering 2008. Could you help us understand whether you are going to reprice later in the year on commercial or what your plans are?

[DeVeydt]: Christine, no, first of all, that's what I always appreciate and love about you is you don't pull any punches and you hit us head on with it. No, *I am very confident in our pricing right now.* I really am. Keep in mind, and I think your comments are dead on. What it really says is that our high single-digit margin for adverse development within '07 was not what we thought it was within some of the quarters. And so when you adjust for it, you get it back to where it needs to be.

[Analyst]: What that means is that medical trends had to have been higher than you expected when you reserved, so your baseline trend is higher. True or false?

[DeVeydt]: No, *I think it's true to say that medical trend was slightly higher than we had expected. I would also say that relative to our pricing we had assumed next year, meaning '08, we had contemplated some of that higher trend.*

When we saw October, which, again, October was more of an anomaly. It wasn't really a run rate, but we looked at that and we said look, we've got to think about some of that in some of our pricing that we had been filing at the time and that's what we did. So I'm not worried about '08, but your point is dead on for '07.

\*       \*       \*

[Analyst]: Just getting back to the commentary around days claims payable, Wayne, I think you had described pretty adequately what the issues were that kind of drove it lower sequentially. But when you talk about those higher completion factors and the higher reserve levels on a PMPM basis, when I look back to the fourth quarter of last year, days claims payable are basically flat year over year. So, can you kind of give us an idea of what leaves you confident that -- what should leave us confident that those reserve levels are higher? And maybe give us an order of magnitude given that the days claims payable, really the only number that we have to look at, is telling us that the reserves are fairly comparable, especially given that they were problematic last year?

[DeVeydt]: Yes, I think a couple things. One is, Justin, unlike last year, we had a significant drive in the fourth quarter of this year to drive our outstanding backlogs down significantly. So one is despite having significant paid activity in the quarter as compared to 4Q of last year, we still increased our incurred PMPMs and slowed down our completion factor. So one thing I think to recognize is that, unlike last year, while they may look from a DCP standpoint, apples to apples, they are really not.

*The second thing I would tell you is that having the benefit of what happened throughout this past year and how those reserves developed and where we migrated, one of the things that we've met with the actuaries on and talked about is the fact that we want to ensure that when we go into '08, that we go in with great confidence, that we're not going to fall short. It's still an estimate. I can't tell you that it's going to be exactly 100% right. It could be a little over, it could be a little under. But at this point in time, we're still looking at it.*

\*       \*       \*

[Analyst]: First, I'm wondering when in '07 did you identify that the fourth quarter '06 medical claims liabilities were developing less favorably than you were previously expecting?

[DeVeydt]: Let me make sure I understand the question. Good morning, Charles. You wanted to know when in '07 we identified that '06 was developing less favorably?

[Analyst]: Yes.

[DeVeydt]: (multiple speakers) Q1. *I would say by basically mid February, we had pretty good visibility that we were starting to develop less favorably.*

\*      \*      \*

[Analyst]: the question just relates to Individual, and you did mention there was a bit of a shortfall in the fourth quarter. Maybe if you can tell us what sequentially your Individual enrollment did in the fourth quarter. And then what expectations you have built into Individual for your guidance for 2008. And maybe just some of the markets where you might have seen the pressure around the Individual enrollment?

[DeVeydt]: Well, I tell you, a lot of the pressure we're seeing on the Individual side was in our non-Blue states. We're seeing a fair amount of pressure there. In a few of our Blue states, we have seen some pressure, mostly in large metropolitan areas. And we have at least one competitor who is doing very rational pricing. The pricing is very rational. But as you know, with Individual business, you are generally writing somebody at the healthiest stage in their life. And so these competitors are applying a very appropriate strategy. They're coming into markets. They're pricing appropriately, but they are offering a higher commission. And so we've seen some slight deterioration in some of our Blue metropolitan areas, specifically in Georgia and California, would be the two Blue states that we've seen some declines. But a significant portion of that decline is actually occurring in our non-Blue states.

[Analyst]: Okay. And then Wayne, just interested in sort of how you are approaching assumptions around the slowing economy. And I know you have talked previously about building in some expectations for higher attrition. And maybe just if you could update us on sort of how you are approaching expectations for attrition. And then also how you think about medical cost trends as the economy slows in terms of, is this an offset to slowing

enrollment? Or do you think about medical cost trends actually accelerating as the economy slows?

[DeVeydt]: *It's interesting, we have baked into our guidance an assumption for a slowdown and specifically, we were very specific about it relative to the National Account business that we had expected. Now the good news is I think our assumptions were conservative and we are actually seeing slightly better than expected results there, which is good.* But I think we are far from having this economy downturn be final. And so we're not ready to declare victory there that we've got it 100% right. But right now I would say some of our assumptions appear to be conservative at this point.

Flip side is, we all know that when we start to see reductions in jobs, that you actually end up having an uptick in utilization initially because you have individuals who are taking advantage of those elective services that they didn't have done before. When they know they're losing their job, they try to take advantage of that. So that is something we all have to keep an eye on for the next year relative to that. But we did bake in some of that into our original guidance and right now, and we appear to be okay on that.

*        *        *

[Braly]: Thank you all for your questions. *In closing, we had a productive year in 2007 and we're off to a good start for 2008.* I am very proud of our 41,000 associates for their efforts, accomplishments, and dedication. As 2008 begins, the new executive leadership team and I energetically look forward to leading WellPoint forward with confidence about our ability to truly make a difference in health care and provide more value to our customers and our shareholders. [Emphasis added.]

20.     On February 21, 2008, WellPoint filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by Defendants Braly and DeVeydt. The Company's 10-K, in relevant part, stated:

We have successfully executed our strategy to deliver on our long-term goal of achieving at least 15% growth in EPS. We have accomplished this by focusing on profitable enrollment growth with innovative product offerings, pricing with discipline, implementing initiatives to optimize the cost of care, continuing to leverage administrative costs over a larger membership base,

further penetrating our specialty businesses and by using our cash flow effectively, including share repurchases.

*We intend to continue expanding through a combination of organic growth, strategic acquisitions and capital transactions in both existing and new markets. Our growth strategy is designed to enable us to take advantage of the additional economies of scale provided by increased overall membership as well as providing us access to new and evolving technologies and products. In addition, we believe geographic diversity reduces our exposure to local or regional regulatory, economic and competitive pressures and provides us with increased opportunities for growth.* While we have achieved strong growth as a result of strategic mergers and acquisitions, we have also achieved organic growth in our existing markets by providing excellent service, offering competitively priced products and effectively capitalizing on the brand strength of the Blue Cross and Blue Shield names and marks.

*            *            *

*We regularly review and set assumptions regarding cost trends and utilization when initially establishing claim liabilities. We continually monitor and adjust the claims liability and benefit expense based on subsequent paid claims activity. If it is determined that our assumptions regarding cost trends and utilization are significantly different than actual results, our income statement and financial position could be impacted in future periods.* Adjustments of prior year estimates may result in additional benefit expense or a reduction of benefit expense in the period an adjustment is made. Further, due to the considerable variability of health care costs, adjustments to claim liabilities occur each quarter and are sometimes significant as compared to the net income recorded in that quarter. Prior period development is recognized immediately upon the actuary's judgment that a portion of the prior period liability is no longer needed or that an additional liability should have been accrued. That determination is made when sufficient information is available to ascertain that the re-estimate of the liability is reasonable.

*            *            *

*Given that our business is primarily short tailed, the variance to total net incurred medical claims . . . is used to assess the reasonableness of our estimate of ultimate incurred medical claims for a given calendar year with the benefit of one year of experience. We expect that substantially all of the development of*

*the 2007 estimate of medical claims payable will be known during 2008.* [Emphasis added.]

21.    The statements contained in ¶¶ 18-20 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company's medical costs were rising drastically, while at the same time the Company's reserves for medical costs were understated; (2) that the Company's growth in enrollment was in the less profitable sectors, such as self-funded members and products, and that the Company was not achieving sufficient new enrollment of Fully-Insured Members; (3) that the Company's geographic diversity was not able to neutralize the adverse economic factors affecting the Company; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

## The Truth Begins to Emerge

22.    On March 10, 2008, the Company shocked investors when, after the market closed, it issued a press release entitled, "WellPoint Revises 2008 Earnings Per Share Guidance." Therein, the Company, in relevant part, stated:

> *WellPoint, Inc. (NYSE: WLP) today announced that it now expects full year 2008 net income to be in the range of $5.76 to $6.01 per share, assuming net realized investment gains of approximately $0.06 per share, which is a revision from the previous forecast of $6.41 per share. This revised growth outlook represents an increase of approximately 4 to 8 percent over net income of $5.56 per share reported for the year ended December 31, 2007.*
>
> *Net income for first quarter ending March 31, 2008, is now expected to be in the range of $1.16 to $1.26 per share, assuming net realized investment gains of approximately $0.06 per share, compared with the prior forecast of $1.44 per share and the $1.26 per share reported for the first quarter of 2007.*

*"We are making these revisions to our prior earnings guidance due to higher than expected medical costs, lower than expected fully insured enrollment and, to a lesser extent, the changing economic environment in which we are operating,"* said Angela F. Braly, president and chief executive officer of WellPoint, Inc. "While we are disappointed with having to revise our 2008 outlook, we are still expecting growth this year, with record levels of membership, revenue and earnings per share. We are taking actions and making investments in our business to further improve our performance during the balance of this year and beyond."

*The revision in full year 2008 earnings guidance is primarily attributable to the following areas:*

*Higher Than Expected Medical Costs. The Company incurred higher-than- expected medical costs during the first two months of 2008 and has revised its full year outlook for Individual and Local Group fully insured medical cost trends to a range of 8.0 percent, plus or minus 50 basis points. Medical cost trends are also being impacted by less favorable than expected prior year reserve development in 2008.*

*Lower Than Expected Fully Insured Enrollment. Medical enrollment exceeded 35.2 million members as of February 29, 2008, representing growth of 410,000 members from December 31, 2007. Although this overall membership increase was in-line with the Company's expectation, the composition of growth was weighted more towards self-funded products than the Company planned. Enrollment in fully insured products was below expectations primarily due to a shortfall in Medicare Advantage growth and declines in Small Group and Individual membership.*

*Changing Economic Environment. The Company believes that current economic conditions have partially contributed to the lower fully insured enrollment results and higher than expected benefit buy-downs. In addition, a Medi-Cal premium reduction is scheduled for July 1, 2008, in California, the Company's largest State Sponsored market with approximately 1.2 million members.*

"We continue to have a strong financial base," noted Wayne DeVeydt, executive vice president and chief financial officer of WellPoint, Inc. "Our operating cash flow is now expected to be approximately $3.7 billion for the year, down from our earlier projections but still above our projected net income. We expect to utilize our strong cash flow to enhance shareholder value by making strategic investments in the products and services we offer

to customers, evaluating merger and acquisition opportunities in a prudent fashion, and effectively managing our capital."

**OUTLOOK**

**Full Year 2008:**

***The Company now expects net income to be in the range of $5.76 to $6.01 per share, assuming net realized investment gains of approximately $0.06 per share.***

Year-end medical enrollment is now expected to be approximately 35.3 million members, representing growth for the year of approximately 500,000 members.

Operating revenue is now expected to be approximately $62.0 billion.

The benefit expense ratio is now expected to be in the range of 82.8 to 83.1 percent.

The SG&A expense ratio is now expected to be approximately 14.3 percent.

Operating cash flow is now expected to be approximately $3.7 billion, or approximately 1.2 times net income.

**First Quarter 2008:**

The Company now expects net income to be in the range of $1.16 to $1.26 per share, assuming net realized investment gains of approximately $0.06 per share. [Emphasis added.]

23.     That same day, after the market closed, WellPoint conducted a conference call with analysts and investors.  Therein, the following exchange, in pertinent part, took place:

[Analyst]: Yes, hi. I'm wondering if you could maybe address this from the standpoint of sort of the longer-term view here, from a couple of different angles. Number one, as you talk about revising upward your view of 2007 medical cost trend and, therefore, 2008, can we look at this from a long-term lens and say that medical cost trend, in hindsight, bottomed out in late 2006 or early 2007, and has increased, albeit at a relatively modest rate, since then? And I guess a question related to that is from the standpoint of the classic underwriting cycle in the industry. We did notice that the -- that your Blue brethren companies appear to have had the first negative quarter in underwriting earnings excluding investment gains since

the late '90's. So how do we get comfortable about this being sort of a short-term thing versus maybe a longer-term storm?

[Braly]: Let me try to address the longer-term question, Matthew. I think it's important. *We are recognizing that the trend was understated -- we had underestimated the trend. Whether that is necessarily a decelerating trend going to an accelerating trend isn't necessarily the case. We just know that we had it understated and that that was reflected in the pricing to date.* We know now that we are assuming a higher trend, and we're going to stick with disciplined pricing in our products going forward. And, because we have the opportunity to price our products throughout the year, we're going to do that with discipline and with the higher claims projected than we had had in 2007. [Emphasis added.]

24.    On this news, the Company's shares fell $18.66 per share, or 28.31 percent, to close on March 11, 2008 at $47.26 per share, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased WellPoint's securities between January 23, 2008 and March 10, 2008, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

26.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, WellPoint's securities were actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by WellPoint or, its

transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

28.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of WellPoint; and

        (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

30.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

31.    The market for WellPoint's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements, and failures to disclose, WellPoint's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired WellPoint's securities relying upon the integrity of the market price of WellPoint's securities and market information relating to WellPoint, and have been damaged thereby.

32.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of WellPoint's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

33.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about WellPoint's financial well-being and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of WellPoint and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the

damages complained of herein.

## LOSS CAUSATION

34.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

35.    During the Class Period, Plaintiff and the Class purchased WellPoint's securities at artificially inflated prices and were damaged thereby.  The price of WellPoint's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

36.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding WellPoint, their control over, and/or receipt and/or modification of WellPoint's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning WellPoint, participated in the fraudulent scheme alleged herein.

37.    Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 136,659 shares of the Company's stock for gross proceeds of $10,133,159 including over $8.8 million in gross proceeds received by the

Individual Defendants. This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| March 7, 2008 | DeVeydt, Wayne S. | 9,638 | $67.12 | $646,902 |
| March 3, 2008 | Sassi, Brian A. | 586 | $70.80 | $41,488 |
| March 3, 2008 | Miller, Cynthia S. | 588 | $70.80 | $41,630 |
| March 3, 2008 | Lewis, Dijuana K. | 1,180 | $70.80 | $83,544 |
| March 3, 2008 | Goulet, Kenneth R. | 842 | $70.80 | $59,613 |
| March 3, 2008 | Braly, Angela F. | 3,576 | $70.80 | $253,180 |
| March 3, 2008 | DeVeydt, Wayne S. | 1,374 | $70.80 | $97,279 |
| March 3, 2008 | Brown, Randal L. | 1,285 | $70.80 | $90,978 |
| March 3, 2008 | Boxer, Mark L. | 1,750 | $70.80 | $123,900 |
| March 3, 2008 | Nussbaum, Samuel R., MD | 1,622 | $70.80 | $114,837 |
| March 3, 2008 | Glasscock, Larry C. | 9,765 | $70.80 | $691,362 |
| March 3, 2008 | Lewis, Randall J. | 872 | $70.80 | $61,737 |
| February 27, 2008 | Glasscock, Larry C. | 18,000 | $73.90 - $74.04 | $1,331,000 |
| February 27, 2008 | Glasscock, Larry C. | 10,000 | $73.88 | $738,800 |

| February 26, 2008 | Glasscock, Larry C. | 26,400 | $74.17 - $74.31 | $1,960,000 |
|---|---|---|---|---|
| February 26, 2008 | Glasscock, Larry C. | 1,600 | $74.16 | $118,656 |
| February 25, 2008 | Braly, Angela F. | 6,968 | $74.58 | $519,673 |
| February 15, 2008 | Burke, Sheila P. | 2,000 | $74.86 | $149,720 |
| February 14, 2008 | Goulet, Kenneth R. | 7,500 | $74.05 - $74.07 | $555,000 |
| February 6, 2008 | Glasscock, Larry C. | 26,113 | $78.94 | $2,061,360 |
| February 6, 2008 | Glasscock, Larry C. | 5,000 | $78.50 | $392,500 |
| | **TOTAL:** | **136,659** | | **$10,133,159** |

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

38.     At all relevant times, the market for WellPoint's securities was an efficient market for the following reasons, among others:

(a)     WellPoint's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, WellPoint filed periodic public reports with the SEC and the NYSE;

(c)     WellPoint regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting

services; and

(d)     WellPoint was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

39.     As a result of the foregoing, the market for WellPoint's securities promptly digested current information regarding WellPoint from all publicly-available sources and reflected such information in the price of WellPoint's securities.  Under these circumstances, all purchasers of WellPoint's securities during the Class Period suffered similar injury through their purchase of WellPoint's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

40.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of WellPoint who knew that those statements were false

when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

41.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase WellPoint's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

43.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for WellPoint's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

44.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about WellPoint's financial well-being and prospects, as specified herein.

45.     These defendants employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of WellPoint's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about WellPoint and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of WellPoint's securities during the Class Period.

46.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

47.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing WellPoint's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

48.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of WellPoint's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of WellPoint's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired WellPoint's securities during the Class Period at artificially high prices and were damaged thereby.

49.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that WellPoint was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their WellPoint securities,

or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

50.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

51.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

52.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.    The Individual Defendants acted as controlling persons of WellPoint within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

55.     As set forth above, WellPoint and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  April 22, 2008

COHEN & MALAD, LLP

Scott D. Gilchrist

Irwin B. Levin
Richard E. Shevitz
Scott D. Gilchrist
One Indiana Square
Suite 1400
Indianapolis, Indiana  46204
Telephone: 317/636-6481
317/636-2593 (fax)
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com


**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
Richard A. Maniskas
D. Seamus Kaskela
David M. Promisloff
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)
rmaniskas@sbtklaw.com
skaskela@sbtklaw.com
dpromisloff@sbtklaw.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATION

I, Donald W. Clement ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the Complaint, and authorizes its filing.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's purchase and sale transaction(s) in Wellpoint, Inc. (NYSE: WLP) security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| Common Stock | 200 | (B) | | 2/14/08 | $74.09 |
| | | | | | |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.     Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.     During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____.

7.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _15th_ day of _April_, 2008

DONALD W. CLEMENT